[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this real estate tax appeal, the plaintiff, Aetna Life Insurance Company (Aetna), claims that the assessor for the City of Middletown (City) overvalued for tax purposes Aetna's property located at 1000 Middle Street on the October 1, 1995, 1996 and 1997 grand lists.
In 1980, Aetna announced plans to develop a headquarters facility for its Employee Benefits Division and a computer center in Middletown. Aetna purchased 269.7 acres of undeveloped land at 1000 Middle Street for $5,448,000, or $20,000 per acre. Aetna conveyed approximately 6.7 acres on the east side of the property to the City in 1982 for the construction of Industrial Park Road, leaving a balance of 263 acres of land. The subject land occupies a hillside location overlooking Interstate 91 and other public roads in Middletown.
With the expectation of adding valuable real estate to its tax rolls and bringing in thousands of employees, the City entered into an incentive development agreement with Aetna in 1981 to encourage it to build its headquarters in Middletown. The incentive agreement between Aetna and the City provided for an original assessed value of the land of $2,000,000. The assessed value would increase on October 1, 1987 to $4,700,000 based upon an agreed upon fair market value of $6,714,285, or approximately $25,000 per acre. Aetna and the City also agreed that as of CT Page 1778 October 1, 1987, the fair market value of the improvements would be $243,950,800, for a total valuation of Aetna's fee simple interest in the subject property as improved of $250,665,085. The incentive agreement provided that the assessed value of the improvements would be set at 40% of the agreed upon value of the improvements by Aetna and the City to run for seven years from the date of the grand list following the issuance of the certificate of occupancy. The final certificate of occupancy for the subject was issued on August 28, 1984. The tax assessment for the subject began on the grand list of October 1, 1984. The City completed a statutorily mandated revaluation of all property in Middletown for the grand list of October 1, 1987. As a result of this revaluation and the impact it would have on property owners, the City approved a phase-in of the assessment of all property in the City for ad valorem tax purposes. For the grand list of October 1, 1987, the subject property was taxed on 30% of the property's value. The phase-in increased each year by 10% until 1991, at which time all property in Middletown was assessed at 70% of value. The total tax savings to Aetna for the period from 1982 to 1990 was $20,712,536. (Defendant's exhibit X.) Aetna paid the full property tax on the subject property for the grand lists of 1991, 1992, 1993 and 1994. This appeal was subsequently filed contesting the valuation of the property on the grand lists of October 1, 1995, 1996 and 1997 as of the last revaluation date of October 1, 1987. The total fair market value of the subject property, during this period of time, as set by the assessor, was $250,665,000.
Prior to the construction of the headquarters building, Aetna retained Hellmuth, Obata and Kassabaum (HOK), a nationally recognized architectural firm with specific expertise in the design of large corporate headquarters buildings. In 1981, Aetna contemplated constructing a 1,300,000 square foot corporate headquarters in the form of a mall for its Employee Benefits Division and a computer center. Aetna required HOK to design the corporate headquarters building so that it could later be expanded to 2,500,000 square feet. The design of the corporate headquarters building consisted of a distinctive, six story complex with a ground level and levels 1-6 with three core sections or pods consisting of interconnected octagons surrounding a central atrium extending up through each of the six levels. The purpose of the design was to segment the massive headquarters building into sections and to provide light to interior areas of the building. The headquarters building was constructed between March 1981 and April 1984. The construction was completed on a "fast track" basis, which resulted in many change orders and cost increases.
The headquarters building consists of approximately 1,490,000 square feet of gross building area and is used primarily as office space. Although Aetna originally intended to locate more than 7000 employees on CT Page 1779 this campus, the planned expansion never materialized, resulting in about 5000 employees working there. The headquarters building contains many special features for employees such as a health and fitness center, auditorium with a seating capacity for 700 people, a lecture hall with a seating capacity for 115 persons, eighteen conference rooms, a convenience store, a hair salon, executive and employee dining areas, a cafeteria with seating for 2100 persons, as well as a sky-lit central court containing a large granite water fountain.
The computer data center, separate from the headquarters building, was constructed in 1982 with three levels containing approximately 120,000 square feet of gross building area and is connected to the main headquarters building by a tunnel.
The maintenance building contains approximately 7570 square feet of gross building area and is used for storage and related uses. Parking structures containing approximately 215,000 square feet of gross building area accommodate parking for 538 vehicles. The balance of the improvements to the subject property consists of a covered walkway, roads, paving and landscaping, an outdoor recreation area with two softball fields and a jogging/hiking trail, and a helipad off the north branch of Aetna Drive.
The total historical cost of the headquarters building was $146,883,300, which included the cost of site development and parking garage, but excluded the cost of the land, the maintenance garage and the computer center. (Defendant's Exhibit A, p. 58; see Plaintiff's exhibit 10, p. 72.) According to Arnold Grant, the plaintiff's appraiser, the total historical project costs were $167,846,318, consisting of $161,846,318 for the improvements and $5,415,000 for the land. (Plaintiff's exhibit 10, p. 72.)
On June 28, 1985, Aetna entered into three separate agreements with Colonial Bank and Michael J. D'Angelico as trustees of Middletown Trust (Trust). The first agreement Aetna entered into was a ground lease with the Trust as lessee covering 54.49 acres of the total tract of 263 acres. All of Aetna's improvements, including the headquarters building, computer center, maintenance garage and parking garage were located on the 54.49 acres. This ground lease was for 25 years with an option by the Trust, as lessee, to extend the lease for ten consecutive terms of five years each. At the same time, Aetna sold the improvements on the 54.49 acres to the Trust for $225,000,000 and took back a sublease of the 54.49 acres from the Trust together with the improvements. The lease of the 54.49 acres with the improvements was for a term of 25 years with five additional five year consecutive terms. The result of this transaction, known as a sale leaseback, was that the Trust owned the improvements with CT Page 1780 a stepped-up basis from the historical building costs $161,846,318 to $225,000,000, together with a lease of the 54.49 acres. Aetna ended up owning the balance of the 263 acres of land with a reported gain of $61,500,000 on the sale of the improvements to the Trust. (Plaintiff's exhibit 10, p. 143.)
The lease between Aetna and the Trust covering the 54.49 acres with the improvements provided for no rent the first year and thereafter rent at $24,937,127 yearly for the next seven years. (Plaintiff's exhibit 10, p. 144.) As a condition of the sale leaseback, the Trust was required to obtain, at its cost, an independent MAI appraisal of the property reflecting that the property had a minimum value of $225,000,000. (Plaintiff's exhibit 10, p. 145.) Aetna was required to execute a fee mortgage and collateral assignments of leases and rents to the Trust to secure Aetna's performance under the lease. (Plaintiff's exhibit 10, p. 146.) Under the terms of the lease of the 54.49 acres and the improvements to Aetna, Aetna agreed to pay the taxes, utilities, maintenance, insurance, structural and non structural repairs so that the lease was an absolute net lease. (Plaintiff's exhibit 10, p. 150.) The lease of the 54.49 acres from Aetna to the Trust called for a yearly rent of $630,000 for the primary and extended terms of the lease. Schedule C of this lease from Aetna to the Trust determined that the value of the lease was $6,300,000, equivalent to an annual rent of $630,000. (Plaintiff's exhibit 10, p. 148.) The lease of the 54.49 acres and the improvements to Aetna called for the following yearly rental payments:
Years 2-8, $24,937,127 payable in arrears (through year 1993).
Years 9-18, $27,779,959 payable in arrears (1994-2003).
Years 19-25 $30,298,609 payable in arrears (2004-2010).
Years of extended terms, $27,246,195 payable in arrears (2011-2034).
(Plaintiff's exhibit 10, p. 149.)
Aetna's appraiser, Arnold J. Grant, rendered an opinion that the fair market value of the 54.49 acres with improvements was $162,300,000, and the value of the excess land was $5,400,000, for a total fair market value of $167,700,000 on the October 1, 1987 grand list. (Plaintiff's exhibit 10, pp. 1, 139.) The City's appraiser, John J. Leary, rendered an opinion that the fair market value of the subject property was $260,000,000, as of October 1, 1987. Leary placed an additional value of $25,000,000 on the value of the excess contract rent being paid by Aetna to the Trust. (Defendant's exhibit A, p. 80.) The assessor for the City placed a fair market value on the subject premises as of October 1, 1987 CT Page 1781 at $250,665,000.
Grant's opinion of the highest and best use of the property, as of October 1, 1987, as improved, was for office and related activities including data processing, parking, and maintenance. (Plaintiff's exhibit 10, p. 49.) Grant recognized that the headquarters building was not designed for multi-tenant use and therefore, its highest and best use should be its continuation of its present use. (Plaintiff's exhibit 10, p. 48.) Leary also determined that the highest and best use of the property as improved was its existing use. (Defendant's exhibit A, p. 52.)
For his final opinion of value, Grant used a percentage of the cost approach, the sales approach and the income approach. Grant concluded that the value of the subject property using the cost approach was $150,000,000. Grant's main premise, in his use of the cost approach, was that the headquarters building was poorly designed and highly inefficient. Because Grant considered the headquarters building to be inefficient, in one of his calculations he reduced the 1,490,000 square feet of the building to 1,250,000 square feet as his estimate of an efficient building. Based on a 1,250,000 square foot headquarters building, Grant used the calculator cost section of the Marshall Valuation Service, with the corresponding index for 1987, to arrive at a cost of $146,051,197 as the estimated cost new of all improvements, then deducted 1% for physical depreciation to arrive at a net cost of $144,590,685. Grant valued the 269.7 acres of land at $40,000 per acre for a total value of $10,800,000 as of October 1, 1987.[1] For the purposes of valuation, Grant allocated $5,400,000 as the value of the improved site, and $5,400,000 as the value of the excess land. Grant did not include the value of the excess land in his cost approach value estimate. (Plaintiff's exhibit 10, p. 79.)
Grant next used the income capitalization approach to arrive at value. Grant noted that the headquarters building contained about 28% of its space as common areas including the large central atrium. Grant was of the opinion that the market would not support a building that devotes 28% of its space to common areas. Grant also concluded that the total usable space, because of the design inefficiencies, was 1,190,000 square feet rather than the actual 1,490,000 square feet of gross building area. He therefore based his calculations using the income approach on a rentable area of 1,190,000. Grant estimated the market rent of the headquarters and computer buildings at $13.25 per square foot of triple net rentable area and $5 per square foot of triple net rentable area for the maintenance garage. Grant deducted 5% for vacancy and credit loss and applied a capitalization rate of 9.2% to arrive at a rounded fair market value of $171,500,000 as of October 1, 1987 using the income approach. CT Page 1782 (Plaintiff, exhibit 10, p. 108.) In arriving at value using the income approach, Grant did not use the rental figures derived from the 1985 sale leaseback transaction between Aetna and the Trust because Grant considered the sale leaseback a form of financing, not a bargained-for lease.
Using the comparable sales approach, Grant determined that the fair market value of the property as of October 1, 1987 was $196,250,000, excluding the value of the excess land. Grant excluded the sale leaseback transaction in this approach because, in his opinion, this transaction was not a true sale, but rather a financing transaction. Grant acknowledged that he had little confidence in the sales approach because of his inability to find truly comparable owner-occupant sales, given the subject property's extremely large size.
Grant placed his greatest faith in the cost approach. In arriving at his final value for the subject property, Grant weighed the three approaches to value, as of October 1, 1987 as follows:
Cost approach $150,000,000 60%
Income approach $171,500,000 25%
Sales approach $196,250,000 15%
Aggregate fair market value of improved site $162,312,500
Value of excess land $5,400,000
Rounded to $167,700,000
(Plaintiff's exhibit 10, pp. 138-40.)
The City's appraiser, Leary, also used the three basic approaches to value to arrive at the fair market value of the subject as of October 1, 1987. Leary arrived at a median of the values using the cost approach from a low of $250,000,000 to a high of $262,000,000; using the sales comparison approach from a low of $254,000,000 to a high of $262,000,000; and using the income capitalization approach from a low of $258,000,000 to a high of $282,000,000. Leary's final valuation estimate was $260,000,000. (Defendant's exhibit A, p. 80; defendant's exhibit V.) Leary placed the greatest weight on the income approach contending that the cost approach was the least reliable with the sales approach coming in second.
Leary placed the greatest weight on the income approach because he CT Page 1783 considered the income approach most useful in the valuation of real estate used for investment purposes. (Defendant's exhibit A, p. 70.) The use of the subject, as investment real estate, is at odds with Leary's finding of the highest and best use of the subject as a 1,589,106 square foot corporate headquarters on a 263 acre site. (Defendant's exhibit A, p. 52.) In Leary's search for market rent, he found that the contract rent between Aetna and the Trust exceeded market rent. (Defendant's exhibit A, p. 73.) Leary used four leases in which Aetna leased office space in Middletown, Rocky Hill and Hartford. These leases were for 54,961 square feet in the Midpoint Office Park in Middletown; 8810 square feet in the I-Tech Center in Rocky Hill; 114,099 square feet in Corporate Ridge in Rocky Hill; and 420,355 square feet in the Xerox Center in Hartford. The fifth lease used by Leary was a lease by Connecticut General from Metro Center in Hartford for 280,395 square feet. From these leases, Leary concluded that the absolute net rent of the comparable leases, ranging from a low of $13.24 per square foot to a high $18.33 per square foot, resulted in a market rent for the subject property of $16 to $18 per square foot of net rentable area. (Defendant's exhibit A, p. 73.) Multiplying a market rent of $16 to $18 per square foot by the 1,259,913 square foot net rentable area, Leary arrived at a net rental income for the subject of $21,758,608 to $24,478,434. Using a vacancy/management/reserve allowance of 7.5% to 10.0%, and a direct capitalization rate of 7.5% to 8.0%, Leary arrived at a capitalized value range of $251,580,000 to $275,380,000, plus excess land valued at $6,250,000. (Defendant's exhibit A, p. 74.)
Leary concluded that the contract rent between the Trust and Aetna exceeded the market rent, and therefore should be valued separately. Leary found that the present value of the remaining excess contract rent on October 1, 1987 was $25,000,000 and added this value to his previous determination of fair market value of $260,000,000. (Defendant's exhibit A, p. 80.)
General Statutes § 12-63b (b) requires the assessor to consider the contract rent applicable to the subject building as well as market rent in determining the value of property using the income approach to value. See First Bethel Associates v. Bethel, 231 Conn. 731, 739-40, 651 A.2d 1279
(1995). The separate valuation of the excess rent as determined by Leary, which was added as a separate component to the value of the subject property, based on market rent, is in reality a nonrealty component of value. Appraisal Institute, The Appraisal of Real Estate
(10th Ed. 1992), p. 435. Excess rent cannot stand alone as a separate value of real estate as presented by Leary. See First Bethel Associatesv. Bethel, supra, 231 Conn. 739. For these reasons we find no justification for Leary's treatment of the excess rent in this case as a separate component to value. CT Page 1784
In his appraisal report, Leary refers to two appraisals of the Union Carbide Corporation headquarters campus in Danbury, Connecticut as background information. (Defendant's exhibit A, p. 72.) The first of these two appraisals was done by Cushman Wakefield of Connecticut, Inc. as of February 1986, and the second appraisal was done by Marshall 
Stevens Incorporated as of December 1, 1986. The Union Carbide campus contained 1,308,721 square feet and a net rentable area of 1,198,380 square feet. Aetna was listed in both of these appraisals as a comparable rental with an average rent per square foot of $20.90. Leary's analysis of the Aetna contract lease to Trust on June 28, 1985 is that the 25 year seven month primary lease had a gross building area value of $18.09 per square foot, and a net rentable area value of $21.09 per square foot. Since the two Union Carbide appraisals were done in 1986, close to the revaluation date of the subject property in 1987, and the Union Carbide property seems so similar to the subject property both in use and size, it is surprising that Leary did not use this property as a comparable sale or rental or provide some explanation as to why he did not use it as a comparable.
Contrary to Grant's use of the replacement cost to determine the value of the subject buildings, Leary used the reproduction cost approach.[2]
Leary selected reproduction cost because the buildings were only three years old in 1987. Leary used the 1985 Project Budget Report by Aetna Facilities Management trended from June 1981 to October 1987 using a 1.415 multiplier for the Hartford sector derived from Marshall Valuation Service. The construction contracts were based on June 1981 cost budgets. These costs indicated a reproduction cost new in June 1981 of $146,883,300 and trended to October 1987, the reproduction cost new amounted to $207,839,870. To this amount, Leary added the costs for site improvements of $15,929,373 plus an entrepreneurial profit of 7.5% to 12.5%. Leary deducted accrued depreciation at 3.75% for the building and 15% for the site improvements to arrive at a total value using the cost approach of $229,000,000 to 239,000,000 for the headquarters building. (Defendant's exhibit A., pp. 59-60.) Adding in the value of the computer building of $21,600,000 to $22,700,000 (including the entrepreneurial profit and the 3.75% depreciation), Leary's total cost approach value for the property was $250,000,000 to 262,000,000. (Defendant's exhibit U.)
Using the sales comparison approach to value, Leary analyzed four sales representative of the corporate headquarters sub-market in the greater Hartford area preceding the revaluation date of October 1, 1987. Sales 1, 2 and 4 were single tenant occupancies by insurance companies. Sale 3, One Financial Plaza in Hartford, is a multi tenant office building with 642,850 square feet of gross building area. Sale 1, Security Insurance Headquarters in Farmington, had 138,130 square feet of gross CT Page 1785 building area. Sale 2, Connecticut River Plaza in Hartford, had 560,950 square feet of gross building area. Sale 4, Metro Center I in Hartford, had 314,762 square feet of gross building area. Leary's range of adjusted sale prices was between $150.15 and $169.58 per square foot. Leary added the excess land at $3.93 per square feet to the adjusted sale prices to end up with a value range of $160 to $165 per square foot of gross building area. Multiplying 1,589,106 square feet of the headquarters and computer buildings by $160 and $165 resulted in a rounded final value range of $254,000,000 to $262,000,000.
Grant and Leary, who are both experienced appraisers, are $117,300,000 apart in their valuation estimates of the subject property as of October 1, 1987. Leary's value is $34,335,000 higher that the assessor's valuation. Grant's value is $82,965,000 lower than the assessor's valuation. Aetna and the City had agreed to the valuation of the subject property based upon Aetna's desire to obtain a tax break and the City's desire to add a valuable property to the City's tax roles and add more than 5,000 employees to the local economy. This property contains an unusually large campus type facility of almost 1.5 million square feet of gross building area, a computer center containing almost 120,000 square feet of gross building area, a parking garage containing 215,000 square feet of gross area, and a maintenance garage with 7570 square feet of gross area plus 263 acres of land with roads, bridges, landscaping and a heliport. This complex is not your typical office building such as those selected as comparables by both appraisers, nor was there a ready market for a corporate headquarters of the size of the subject. The disparity in the value estimates of the two experienced appraisers in this case highlights just how difficult this property is to value.
Because the subject is an extremely large building that is not common to the real estate market, we find that the comparable sales approach is of little use in valuing the subject property. The five comparables Grant used in his sales approach were all less than 161,000 square feet of building area, whereas the subject had approximately 1.5 million square feet. Grant notes that "[t]he subject's main office building is one of the largest office buildings in Connecticut. Newly created structures of such massive scale are seldom offered for sale on the open market. An organization seeking to secure such a facility would most likely have to build the structure." (Plaintiff's exhibit 10, p. 138.) We concur with Grant's analysis. The largest comparable sale used by Leary was the 642,850 square foot One Financial Plaza in Hartford, which is a multi tenant building half the size of the subject building.
For the same reason that we find the sales approach to be of little value in this case, we also find the income capitalization approach to be equally of little value. The so-called comparable buildings used by Grant CT Page 1786 and Leary to determine market rent are also of little use, because they are not close to the size of the subject, have relatively short term leases and are mostly multi tenant buildings.
We find that the most credible approach to determining the fair market value of the subject is the cost approach. Construction of the buildings was completed just three years prior to the October 1, 1987 revaluation date. Grant was of the opinion that the subject headquarters building had an inefficient design creating common areas with limited functional utility. We disagree. Grant does not take into account that the subject design and construction met Aetna's goal to provide a building that would house 5000 to 7000 employees. The headquarters building met the needs of the employer and its employees, not the needs of an investor. Grant selected the replacement concept in his analysis using the cost approach to value based upon his premise that the headquarters building had significant functional depreciation because of the inefficient design of the building. He performed three cost approach calculations. (Plaintiff's exhibit 10, pp. 69-79.) The first calculation detailed the actual cost to create the subject buildings. After deducting 1% physical depreciation, this calculation yielded a cost of $168,566,175. The second calculation presented the cost to create an efficient main office building of 1,250,000 square feet of gross building area providing the same functional utility as the subject building. After deduction 1% physical depreciation, this calculation yielded a cost of $144,590,685. The third calculation showed the cost of the subject buildings with deductions for physical and functional depreciation. This calculation yielded a cost approach value adjusted for functional depreciation of $149,990,685. Grant computed the value of the functional depreciation based upon inefficient design to be almost $24,000,000. Grant's final opinion of value under the cost approach was $150,000,000.
Leary, on the other hand, selected the reproduction cost concept because he considered the headquarters building to be a fairly new three year old building, constructed to meet the needs of Aetna in providing a home for its employees. We agree with Leary that the highest and best use is a continuation of the present use by Aetna as a corporate headquarters. The reproduction cost concept most clearly fits the objective of Aetna as a corporate employer rather than that of a typical investor.
Grant found the actual cost of constructing the subject buildings was $161,846,318. (Plaintiff's exhibit 10, p. 72.) Leary found the historical costs new for the headquarters building to be $146,883,300 as of 1981. These costs were obtained from the May 14, 1985 Project Budget Report by Aetna Management Facilities. Leary adjusted this amount with a Marshall Valuation Service multiplier of 1.415 to arrive at an October 1, 1987 CT Page 1787 reproduction cost new of $207,839,870. (Defendant's exhibit A, p. 58.)
Although Aetna objects to Leary's inclusion of entrepreneurial profit as part of the construction costs, its appraiser, Grant, also added 2% for "Organization/Entrepreneurial" in his cost calculations. (Plaintiff's exhibit 10, pp. 74, 76, 78.) "[E]ntrepreneurship represents a legitimate cost of development and should be included in the estimate of development costs." Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 327. While we agree that entrepreneurship represents some part of development costs, we are not prepared to accept Leary's opinion that entrepreneurship should represent 7.5% to 12.5% of reproduction costs new, which produces a profit of $15,587,990 to $25,979,984 to Aetna just for constructing the building as an owner/occupant. We consider it more credible to use Grant's selection of 2% for entrepreneurial profit.
As we have previously stated, we disagree with Grant's application of a significant depreciation factor based upon his opinion that the headquarters building was inefficiently designed. On balance, we find Leary's method of determining fair market value of the improvements using the cost approach to be the more credible course to use.
We therefore adopt Leary's computations in arriving at the fair market value of the subject buildings using the cost approach. The historical cost of $146,883,300 in 1981 included the headquarters building, the maintenance building and the parking structure and site work. It did not include the computer building. As stated above, Leary applied a 1.415% multiplier to arrive a reproduction cost new as of October 1, 1987 of $207,839,870. To this amount, we add entrepreneurial profit of 2%, or $4,156,797 to arrive at reproduction cost new plus profit of $211,996,667. Leary determined that the 1987 reproduction cost new of the computer data building was $20,866,040. Adding entrepreneurial profit of 2% results in reproduction cost new plus profit of the computer building of $21,283,361. (Defendant's exhibit U.) We apply Leary's depreciation factor of 3.75% to the buildings and 15% to the site improvements. We find Grant's analysis of the cost of the land at $40,000 per acre as more credible than Leary's value of $60,000 per acre. Whereas Leary's land analysis considered sales of land ten acres and under, we find Grant's use of land assemblages in the area consisting of 77 acres and 31 acres more closely analogous to the subject.
We summarize our finding of the value of the subject using the cost approach as follows:
Reproduction cost new (RCN) as of October 1, 1987 of headquarters building and site improvements $207,839,870 2% Entrepreneurial profit + $4,156,797
CT Page 1788 RCN plus entrepreneurial profit $211,996,667
Accrued depreciation of 3.75% applied to 92.87% of costs allocated to buildings (Defendant's exhibit A, p. 59) 92.87% x $211,996,667 = $196,881,305, less 3.75% accrued depreciation — $7,383,049 Accrued depreciation of 15% applied to 7.13% of costs allocated to site improvements (Defendant's exhibit A, p. 59) 7.13% x $211,996,667 = $15,115,362, less 15% accrued depreciation — $2,267,304
Value of 263 acres @ $40,000 per acre + $10,520,000
RCN of computer building including 2% entrepreneurial profit, less 3.75% depreciation + $20,485,235
Total fair market value using the cost approach $233,531,549
We conclude that the fair market value of the subject property, as of October 1, 1987, was $233,531,549. Since we find that our valuation of the subject property is $17,133,451 less than the valuation placed on the subject property by the assessor, judgment may enter in favor of the plaintiff without costs to either party.
Arnold W. Aronson Judge Trial Referee